THE CITIZENS BUILDING, LOAN AND SAVINGS ASSOCIATION
OF PLAINFIELD

*v.*

WILLIAM McD. CORIELL et al.

The managers of a building and loan association are not personally liable
for losses resulting from an honest mistake in estimating the value of stock-
holders' lands on which they loaned money, nor for a defect in the acknowl-
edgment of a mortgage, which rendered it worthless. But they are liable for
losses from loans made on personal security of the stockholders, in violation
of a by-law limiting the amount of such loans.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. J. J. Bergen* and *Mr. H. M. Gaston,* for complainants.

*Mr. J. Henry Stone* and *Mr. E. W. Runyon,* for defendants.

THE CHANCELLOR.

The bill is filed by the Citizens Building, Loan and Savings
Association of Plainfield, a corporation created under the act "to
encourage the establishment of mutual loan and building associa-
tions," against nine persons and the executors of another, to estab-
lish and enforce the liability of the defendants to indemnify the
complainant for alleged breaches of trust of the nine and the de-
cedent while acting as directors of the complainant for the years
1874, 1875, 1876 and 1877. In 1878, they resigned ánd ceased
to be directors. The specific charges of the bill are that the
directors invested the moneys of the association on insufficient
securities in eight instances, whereby loss has been sustained by
it, and that they neglected, in one instance, to foreclose a mort-
gage when they should have done it, by which neglect, it is
alleged, the association has sustained a loss through the deprecia-

tion of the property.    Of the investments complained of, four
were on loans to Israel D. Ten Eyck, John Schorb, Randolph
Dunham and Fanny N. Moore, respectively, upon the bonds of
the borrowers, secured by mortgage of real property in the city
of Plainfield, and the assignment of stock of the association
owned by them respectively, as collateral security; another was
on loan to Patrick Agney, upon his bond, secured by mortgage
of real property in that city, and the other three were on loans
to Martin Giles, David W. Rogers and W. L. Titsworth, respect-
ively, upon bond and the assignment of stock in the association,
and not secured by mortgage of real property.    The first-men-
tioned four mortgages were in form such as is usual in such asso-
ciations on loans to stockholders, and the Agney mortgage was
of the ordinary sort, not payable as the others were, in monthly
payments, but at a fixed time, with interest.    The complaint in
regard to the loan to Ten Eyck is that, in 1874, the directors
lent to him $3,800, on property on which there were already
three mortgages, two for $5,000 each and one held by the asso-
ciation for $1,000—$11,000 altogether—although, as the bill
alleges, in 1873 they had refused to lend $1,000 on the property,
on the ground that the security was not satisfactory.    And the
complainants further complain, in regard to this transaction, that
in December, 1877, the directors accepted a deed for the property
to the association, by which it assumed the payment of all the
encumbrances; and the bill alleges that the property will not,
at a public sale, realize to the association more than enough to
satisfy the encumbrances, other than the $3,800, and that that
sum is therefore lost to the association.    As to the loan to Schorb,
the complaint is that, in October, 1874, the directors lent to him
$1,600, and in November, 1875, $1,000, taking for security
eighth and ninth mortgages upon his property, on which there
were already mortgage encumbrances to the amount of $15,100,
while the property was not then worth more than $15,000; so
that the association met a loss in the transaction, allowing for
the value of the stock assigned as collateral security, to the
amount of over $1,500.    As to the loan to Randolph Dunham,
the bill states that the directors, in 1874, canceled a first mort-

gage of $2,000, which the association held on his property, accepting, in lieu thereof, a fourth mortgage for the same sum, on other property of his, already encumbered for $8,000, whereby the association, allowing for the value of stock held as collateral security, lost about $1,300; and it further states that, at the time of the exchange, Dunham was seven months in arrears in his payments of installments on his stock. The complaint with reference to the loan to Fanny N. Moore is, that the directors lent $5,000 to her, on second mortgage of her property, already encumbered to the amount of $2,500; that she was then in arrears in her payments on her stock; that the property was not worth over $5,000 and that the first mortgage has been foreclosed and the property sold, and the association has lost about $3,000 of the loan. As to the loan to Agney, it is alleged that it was made in 1876, and was of the sum of $250, and on second mortgage of his property, on which the association had already a mortgage of $1,000; that through the neglect of the directors in seeing to it that there were no encumbrances by way of mechanics' lien, on the property, when the $1,000 loan was made, the loan of $250 was rendered necessary to pay a claim for which such a lien existed, and that the property is not worth more than the amount of the first mortgage, and therefore the association will lose $250 by the transaction. The bill states that the loan to Giles, who was one of the directors, was $600, and was made in 1874, on his personal bond, with no mortgage security; that he was then in arrears upon his stock, and that the $600 are lost. It states that the loan to Rogers, which was of $1,000, and made in 1874, was made on the like security (but it is not alleged that he was then in arrears on his stock), and that the association has lost $425 on that loan. As to the loan to Titsworth, which was of $600, and made in 1876, the complaint is that it was made on like security, and that he was then indebted to the association in $800, for which it held only such security, and it is alleged that the association has lost about $930 on those two loans. The bill also charges upon the defendants neglect in not proceeding by foreclosure, in 1875, to collect the money due from Richard H. Hall on his mortgage for $1,000,

25

to the association, on his property at White House, whereby the association has suffered loss to the amount of $508, in the depreciation of the property. The foregoing are all the specific charges of the bill. It waives answer on oath. The answer fully sets forth the transactions complained of, with a denial of all culpability on the part of the directors.

According to the evidence, the facts in regard to the loans in question are, briefly, as follows:

Upon the Ten Eyck property there were prior encumbrances to the amount of $10,000. The loan of the association was $3,800. The property was valued by the security committee of the board, at the time of making the loan (in 1875), at $17,500, and the cash value of the stock which was assigned as collateral, was, according to the testimony on the part of the defendants, $2,739.46; according to the testimony of the other side, $2,665.07. So that there was a margin of security in the whole of about $10,000 over the prior encumbrances on the property, to secure the payment of the loan of $3,800 made by the association. In support of the valuation is the fact that the property cost Ten Eyck $23,150. He bought it in 1872 or 1873, and gave $15,150 for it, and he afterwards put improvements on it which cost him over $8,000. Its rental value in 1875, when the loan in question was made, was from $2,100 to $2,150. Part of the premises was rented at $1,500, and the rest was occupied by Ten Eyck himself, who swears that the rental value of the part he occupied was from $600 to $650. Many witnesses speak of the value of the property. Four of them are disinterested. Of those four, Mr. Bacon, a real estate dealer, estimates it at from $21,000 to $23,000. Mr. Cook, who sold the property to Ten Eyck, values it at from $16,000 to $17,000, and Mr. Vanderbeek at about $16,000. The valuation of the committee was, it will be remembered, $17,500. It should be stated that the fact that the loans were made on shares of stock held by the borrower, on which he was required to pay monthly installments applicable to the reduction of the principal of the loan as well as the payment of the interest, so that the loan was, in fact, if the installments were paid, reduced monthly by repayment of part of it,

entered into the consideration of the security committee and the board in determining upon the sufficiency of the security, not only in this but in all cases of like loans. The allegation in the bill that in 1873 the board had refused to lend Ten Eyck $1,000 on the security of the property, is not supported. A loan of that amount was awarded to him in 1873, which was not made, indeed, but it was not because the board deemed his property insufficient security, but because he did not then own the requisite stock to entitle him to the loan. He was adjudicated a bankrupt in 1877, and the board, of which the directors whom it is sought by this suit to inculpate were members, bought the property of his assignee for $50, subject to the encumbrances, which were those before mentioned, but no others, which the association assumed. The property is still held by the association. Whether there will be a loss upon it, it is impossible to say positively.

The loan to Schorb was of $2,600, on twenty shares of stock. The security committee valued the property at $20,000. The cash value of the stock was $1,328.30. The prior encumbrances were $14,100, leaving a margin of security in the property itself of $5,900 for the loan in question; to which is to be added the value of the stock, $1,328.30; altogether, $7,228.20. The bill states, however, that the property was not worth over $15,-000. Schorb swears it cost him, with the improvements, $21,-000; that he bought part of the land in 1868 and the rest in 1872, and built upon the property in 1874. Mr. Bacon says the property was worth from $19,000 to $20,000 in 1875. The loan was made in 1874. Of the prior encumbrances none were on the whole property. The property had a frontage of sixteen feet and six inches. $2,500 of the encumbrances were on ten feet of it alone; $6,500 on an adjoining strip of sixteen feet of it alone; $600 on another strip of six feet front alone, and $4,-500 covered both of the two strips of ten and sixteen feet. One of the mortgages taken by the association was on those two strips, and the other was on the whole property. The strip of ten feet has been sold under foreclosure, and nothing was realized to the association; but the defendants insist that the complainants did not properly guard the interests of the association at the sale.

Schorb, it should be stated, paid up his dues on his stock until November, 1877.

The exchange of mortgages made at the request of Randolph Dunham, was of a second mortgage of $2,000 (not the first mortgage, as stated in the bill, there being a prior one of $3,000), upon property of his, for a mortgage apparently fourth, but, as the defendants say, actually the third, on another property of his. The prior mortgages on the latter property were one of $1,000, one of $5,000, and another of $2,000—$8,000 altogether. The last-mentioned mortgage was held by Isaac Clawson, Dunham's father-in-law, who, the defendants say, agreed with the association, when the exchange was made, that its mortgage should have precedence over his. If so, the prior encumbrances were, in fact, only $6,000. The association had, as collateral security, twenty shares of stock, worth then $1,110.17, and the property was valued by the security committee at $12,000; so that at that valuation there was security to the amount of over $7,000 for the loan of $2,000. Mr. Bacon says that the property was worth from $11,-000 to $12,000 in 1875. The constitution expressly gave the directors power to make substitutions. A foreclosure of the mortgage for $5,000 (the second mortgage), under proceedings begun after June, 1878, has taken place, and the property was bought at the sale for $3,000 by the second mortgagee, who has sold it since for $8,300. The Clawson mortgage was not put in under the foreclosure proceedings. The defendants insist that the interest of the complainant, under the foreclosure, was sacrificed by the neglect of the board, for the time being, to attend the sale and buy in or bid on the property. Dunham paid up all arrears when the exchange was made.

The loan to Fanny N. Moore was of $5,000, and was made upon property valued by the security committee at $7,000, with twenty shares of stock as collateral security. There was a prior mortgage of $2,400 on the property. Her stock was then worth $2,534.60. So that, at a valuation of $7,000 for the property, there was a margin of security of about $7,000, including the value of the stock, over the amount of the first mortgage. The borrower was not in arrears when the loan was made.

Mr. Bacon says the property was worth in 1875 (the loan was made in 1874) from $7,000 to $8,000. It has been sold under foreclosure and nothing was realized for the association, but the defendants insist that if there is a loss it is because the property was not bought in for the association, or because of depreciation in value for which they are not responsible.

The loan of $250 to Agney was made to enable him to pay a claim for lumber furnished him for building the extension to the house on his property on which the complainants already had a mortgage of $1,000. For the claim a mechanics' lien could have been established. The property was valued by the security committee at $1,200, and the cash value of his stock was then $504.65, altogether $1,704.65, while the two mortgages (there was no prior encumbrance) amounted to but $1,250. The property has not been sold, and the defendants deny that there need be any loss on it. Agney continued to pay his dues on his stock until after June, 1878.

The Hall mortgage, in respect to which neglect in not foreclosing in 1875 is charged, was taken in 1870. There is no suggestion of culpability or liability for the investment. The mortgage in 1875 was placed in the hands of the solicitor for foreclosure, and would have been proceeded upon but for the fact that Hall induced the board to refrain on his promise to resume payment of his dues, which promise he kept and paid them up to October, 1877, when proceedings for foreclosure were taken, which were stopped subsequently and after June, 1878

The loans to Giles, Rogers and Titsworth on personal bonds and assignments of stock as collateral security, were made when the borrowers were in good financial standing and were not in arrears with the association. The loan to Giles was of $600, and was made in November, 1874. His stock was worth $326.02 at that time, and he continued to pay his dues up to October 20th, 1875, but paid nothing afterwards. His stock was then worth $376.79. He subsequently became insolvent. The loan to Rogers was made under like circumstances and on like security.

It was of $1,000, and was made in April, 1874, on his bond and five shares of stock, worth then $676.70. He was not in arrears, and continued to pay his dues till June, 1876. The loans to Titsworth were two, one in 1874 for $800, and the other in 1876 for $600, and were made on his bond with Joseph D. Spicer as surety, and ten shares of stock, worth in 1876 $744, as collateral. The defendants say that Spicer was solvent until long after June, 1878, and that if there be a loss it is not chargeable to them.

As before stated, the bill contains no charges of misconduct in any matter except in making the investments specified and in neglecting to foreclose the Hall mortgage in 1875. Other charges of irregularities, loose methods &c. were made on the hearing, and the evidence, which is quite voluminous, is directed to them as well as to those mentioned in the bill, but they are not within the issue and must be left wholly out of consideration. The bill contains no imputation of intentional fraud, but its charges are of mismanagement, and, in the making of the loans, violation of the constitution and by-laws. There is no ground, either in the bill or in the evidence, for any charge of corrupt conduct or willful wrong. To consider the charges, and, first, as to the loans made on the security of real estate : the constitution of the association provides that whenever a stockholder shall be declared to be entitled to a loan or loans, he or she shall either pay, or allow to be deducted, the premium offered therefor, and, before receiving the loan, shall secure the payment thereof to the association, by a bond and mortgage, for the full amount of the sum loaned, and by the assignment of the policy of insurance, if required ; and that for every loan of $200 made to a stockholder, at least one share of stock shall be assigned to the association as collateral security. It will be observed that it does not provide that the security shall be by first mortgage ; and, indeed, when the character, objects and methods of such associations are considered, such a provision would, undoubtedly, lead to serious embarrassment in their operations. It is intended that their borrowers shall be their stockholders. The borrowing stockholder is bound to repay (and, theoretically, will

do so) the loan, in monthly installments, applicable to the payment of principal as well as interest, thus reducing the loan at every monthly payment. The law, too, permits him to contract, by valid, lawful, and therefore enforceable, agreement, to pay a large premium for his loan. This fact is not consistent with a requirement that the security shall be of the high character which is demanded for loans on which no premium is paid. In this association, the average of the premiums paid for loans, in 1868, was twenty-one and four-fifths per cent.; in 1869, twenty-two per cent.; in 1870, eighteen and two-thirds per cent.; in 1871, sixteen and one-eighth per cent.; and in 1872, fifteen and one-half per cent. At a meeting in 1874, there were nine loans sold. Three of them brought twenty-four per cent. premium; two, twenty-five; one, twenty-three, and three, twenty-one and one-half. It appears that over two-thirds of the stockholders of this association were borrowers. Again: a requirement that all investments should be on first mortgage would probably frustrate, to a very great extent, one of the chief purposes of the association—to aid persons of small means to obtain homes for themselves, by payment of the price in small installments, extending over a considerable period of time. The directors, undoubtedly, supposed that they were under no obligation to take only first mortgage security. Mr. Pope testifies that the practice of loaning on real estate, on which there were already encumbrances, commenced in February, 1868; that the first mortgage ever taken by the association was a second mortgage. But he swears, also, that only about one-quarter of the mortgages taken were not first mortgages. He also says that when money was lent to one who was not a stockholder, it was almost invariably on first mortgage. To hold directors personally responsible, under such circumstances, because they have taken poor mortgage security, though without intending to do so, but believing it was good, would be unreasonable. And here it may be remarked that the complainant alleges, in its bill, that the persons to whom the loans were made were in arrears, and the constitution prohibits loans to such persons. According to the evidence, they were not in arrears. If, when the loan was awarded, they

were in arrears, but paid the arrears out of the loan, in the absence of bad faith, they would be regarded as not in arrears when the loan was made. These directors served without pay. They were selected by their fellow stockholders to manage gratuitously the affairs of the association in which they and the other stockholders were jointly interested. To apply to them the strict rules which are applicable to trustees who assume the discharge of the duties of private trusts, would be unjust. In the absence of fraud, and where they have neither derived, nor expected to derive, any profit, benefit or advantage from their management which was not common to the other stockholders; when they have acted fairly, and have not been guilty of gross neglect or gross inattention, they should not be held liable. The rule applicable to mandatories is sufficiently stringent for such cases, and is a reasonable one. They should be held liable only in case of fraud, gross negligence or misuser. *Overend & Gurney Co.* v. *Gibb, L. R. (5 H. of L.) 480.* It was so held in *Spering's Appeal, 71 Pa. St. 1.* That was a case similar to this, and involving the same question of liability. It was there said that, while directors are personally responsible to the stockholders for any losses resulting from fraud, embezzlement or willful misconduct, or breach of trust, for their own benefit, and not for the benefit of the stockholders, for gross inattention and negligence, by which such fraud or misconduct has been perpetrated by agents, officers or co-directors, yet they are not liable for mistakes of judgment, even though they may be so gross as to appear absurd and ridiculous, provided they are honest, and are fairly within the scope of the powers and discretion confided to the managing body. In *Hodges* v. *New England Screw Company, 1 R. I. 312,* the court said that if the mistake (referring to the violation of the charter) be such as the directors might well make, notwithstanding the exercise of proper care, and if they acted in good faith and for the benefit of the company, they ought not to be held personally liable. In the case in hand, in the mortgage investments under consideration, there was no dishonesty of purpose, nor any gross neglect, nor gross want of attention. As before remarked, there is no imputation

of fraud, nor any ground for such imputation, in any of the transactions. On the other hand, the directors appear to have acted with entire honesty. They were themselves owners of a considerable amount of the stock. There were two series of it. When they resigned, in 1878, they owned about one-seventh of the whole. There was no concealment of their transactions. There was a meeting of stockholders every month. In estimating the value of property which was proposed as security, they acted with reasonable care. They had a security committee of three of their number, all builders, and all well acquainted with the values of property—men chosen for their fitness for the work, and who seem to have discharged their duty with fidelity. The compensation of the members of that committee was not such as to affect their judgment in favor of the borrower. It was limited to one dollar for each member of the committee and his expenses, in each case to be paid by the borrower. The directors appear to have given due attention to the business of the association. In this connection, the charge of neglect, in reference to the Hall mortgage, may properly be disposed of. The neglect charged is in not proceeding to foreclose that mortgage in 1875. They delivered the mortgage to the solicitor for foreclosure, but, on Hall's agreeing to pay his dues (a promise which he kept for some time thereafter), they refrained from proceeding. In February, 1878, he paid his dues in full, up to October, 1877, but from that time he made no further payments. The constitution provided that if the interest on a loan was suffered to remain unpaid more than six months, the directors might compel payment of principal and interest by ordinary proceedings on the bond and mortgage, according to law. After the lapse of six months from October, 1877, the directors began foreclosure proceedings on Hall's mortgage, which were in progress when they resigned, in June, 1878. These proceedings were not continued, for the reason, it is alleged, that the mortgage proved to be materially defective, for want of acknowledgment by Hall's wife, in whom it is said the title of the property was. But the charge of neglect, in respect to the acknowledgment of the mortgage, is not made in the bill, and, if it had

been, blame for the defect would not be imputable to the directors. They properly relied on the knowledge and attention of the solicitor for the legality of the mortgages. If he was derelict in his duty in that matter, and they were ignorant of it, they are not chargeable. It appears, however, by the minutes of the board, under date of October 8th, 1878, that the discontinuance was ordered on the ground that there was " no equity in the property" to warrant the suit. The Agney mortgage of $250 may be further noticed in this connection. That was a mortgage of the ordinary kind, and the money was lent to protect the $1,000 mortgage to the association then on the property. It is enough to say that, if the property is insufficient security, and the necessity for this loan arose from neglect, it was the neglect, not of the directors, but of the solicitor.

It is urged, however, that as to the loans to Giles, Rogers and Titsworth, on the security of bonds alone, with pledge of stock, the directors are without excuse; that, in making them, they acted *ultra vires;* that such security for loans was forbidden by the constitution. The constitution provides that loans to stockholders shall be secured by bond and mortgage (presumably of real property), and provision is made for loans to persons not stockholders of funds lying unproductive on " undoubted security" (without specifying the character of the security) for a period not exceeding three months. The loans complained of were made to stockholders. It is proved, however, that loans on such personal security, with pledge of stock, were made from the very beginning of the association in 1868. Mr. Pope, who was treasurer for ten years, up to 1878, testifies that it was the constant practice, commencing with the months of March, April and May, 1868, and continued down to 1878 ; that the custom was known by all members, and was no secret; that a majority of the members either borrowed on personal security, or knew that it was done ; and that while those whose conduct is called in question in this suit were in office, such loans were made to the amount of about $75,000, and nothing was lost on them while they were in office. The president of the board elected in 1878 (by the direction of which board this

suit was brought), Mr. Harris, borrowed on such security in 1869, and Mr. Appleton, its secretary, borrowed on such security in 1871 and 1873. That such loans were not regarded as unlawful, appears from the testimony of Mr. Coward, the solicitor of the association. When asked whether he, as solicitor, advised the taking of personal bonds as security for loans beyond the value of the borrower's stock, he answers that he does not know that he advised it, but that he considered the propriety of it with the others. He was a director. He further says that he, himself, got a loan of $1,000 on such security. It would seem, from Mr. Appleton's testimony, that such loans are still made, and are supposed to be legitimate, if not beyond the value of the stock pledged for payment. To the question whether the board of directors have, since June, 1878, made any loans to members on personal bonds without taking a mortgage as security, he answers:

"Only such as are provided for in the by-laws, where the stock assigned as collateral exceeds in value the loan made; I mean the withdrawal value."

On the 18th of December, 1878, as appears by the minutes, it was ordered by the new board that, for loans made on the stock, as collateral security, the treasurer should require, as security, a bond with the transfer of such number of shares of stock as, at the withdrawal value, should equal the face of the loan. It seems, then, that lending money to members on personal bond and pledge of stock, though it is in contravention of the constitution, has never been, and is not yet, regarded as *ultra vires*, but as an entirely legitimate transaction. As to the care taken in making them, up to 1878, Mr. Pope says that when they were made, the amount of other property besides stock which the borrower was possessed of, and his financial standing, generally, were taken into consideration, and that oftentimes (and such appears to have been the case in regard to the loans to Titsworth) another name on the bond would be required, and when a loan was made, on such security, to a member of the board, the terms were fixed by the lenders. The lending, on such security, appears to have been begun when the association started,

Citizens Building Association v. Coriell.

and it was recommended by Mr. Webster, the first president, who said he had found it to work well in another association of which he had been the head, and which had been successful. Mr. Pope says that most of the board of 1880 (there were twelve in it) borrowed money of the association in that way, and it is not denied. Mr. Bachman, one of the board, who was a witness for the complainant, says that he has done so. Mr. Pope further says, and it is not denied, that no objection or protest was ever made to or against the practice. It seems, indeed, to have been fully acquiesced in. Mr. Pope further says that up to the time when those whose conduct is under scrutiny ceased to be directors, the whole number of stockholders was between three hundred and seventy-five and four hundred, and of those, about one hundred and twenty-five (or about one-third of the whole number) borrowed money in that way. But it appears, by the minutes, that on the 7th of March, 1870, a by-law was adopted, to the effect that loans made on the stock of the association should not exceed the amount paid in on the stock, and interest thereon at six per cent. per annum. It is quite clear that the defendants ought not to be held liable merely on the ground that in lending the money of the association on bonds and its stock, they were acting in violation of the constitution, and so exceeded their powers, provided they had observed the provisions of the by-laws on that head. The by-law itself is in violation of the constitution; but the practice, the by-law, the acquiescence, and also what was equivalent to the advice of counsel, would, under the circumstances, have excused them from the consequences of their mistake as to their powers. But the by-law of 1870 was in force when the loans to Giles, Rogers and Titsworth were made, and those loans were all made in contravention of it. Giles borrowed the money in November, 1874. He paid his dues up to October of the year following, and then ceased, because, as he says, he " got tired of paying." He afterwards says, however, that he ceased paying by reason of his financial embarrassment. He was a director, and it does not appear that any step was taken, from the time when he ceased paying to June, 1878, to compel him to pay. He says his embarrassments be-

gan in the fall of 1875. He says he thought he was worth from $8,000 to $10,000 when he borrowed the money, but that since then he has been unfortunate in business. There is not only no evidence that the money due from him could have been collected since June, 1878, but the proof is to the contrary. He says that in July, 1878, he was worth nothing, and has been worth nothing since then. The responsibility for the loss cannot, then, be shifted to those who succeeded the directors by whom the loan was made. The board cannot be excused for lending the money to him in contravention of the by-laws. They cannot be excused for lending the money of the association to a stockholder on personal bond and stock, where the stock was of less value than the amount loaned. There was no warrant, as there is no justification, for their action. They would, under the circumstances, have been excused in lending a sum equal to the amount he had paid in on the stock which he pledged for its payment, and interest thereon, according to the by-law, but they have no excuse for lending beyond that on such security. They have not even any practice to plead. They lent $600 to Giles, on his bond and stock worth then only $326.02. The same observations apply to the loans to Rogers and Titsworth. To the former, they lent $1,000 on stock worth only $676.90, and to the latter, $1,400 on stock worth only $744. The defendants are liable to the company for the loss on those loans, because the directors must be held to have culpably exceeded their powers in making them. Nor can those loans be justified under the provision of the constitution authorizing loans for short periods, on undoubted security, of funds lying unproductive. Such loans are to be made to others than stockholders. The loans in question were made to stockholders, as such, on the security of their stock.

As to the other transactions, the loans on mortgage, enough has been already said to indicate the conclusion. Those loans were not made in contravention of any express provision of the constitution, and there is no evidence of any dishonesty of purpose, but the contrary. If there was error, it was an error of judgment merely. The results complained of, the losses which have been met or are

·apprehended, are to be attributed to excessive valuations· honestly made, and the investment of money on security too slender, indeed, but at the time honestly deemed to be sufficient. The charge of neglect has already been distinctly disposed of. As before stated, the issue includes nothing but the eight loans and the alleged neglect to prosecute Hall. Therefore, all other matters have been left out of consideration. There will be a decree in favor of the complainants for the loss sustained on the Giles, Rogers and Titsworth loans, and the costs of this suit; and, inasmuch as there is no evidence of the non-participation of any ·of the defendants in the making of those loans, and no such ·defence was set up in the answer, or even presented at the hearing, the decree will be against all of the defendants.